UNITED STATES DISTRICT COURTS

SOUTHERN DISTRICT OF NEW YORK

**JUDGE DANIELS**

-------------------------------------------------------------x

CHRISTOPHER DAY,

     Plaintiff,

 -against-

THE CITY OF NEW YORK, THE NEW YORK

COUNTY DISTRICT ATTORNEY'S OFFICE,

GEORGE ARGYROS, IN OFFICIAL CAPACITY

AND INDIVIDUALLY, AND NITIN SAVUR, IN

OFFICIAL CAPACITY AND INDIVIDUALLY,

     Defendants.

-------------------------------------------------------------x

**15 CV 4399**

COMPLAINT

Plaintiff alleges as follows:

### STATEMENT OF JURISDICTION/VENUE

1. The plaintiff herein is Christopher Day. Plaintiff is a resident of the State of New York and resides at 423 Guyon Avenue, Staten Island, New York 10306. Such residence falls under the jurisdiction of the Eastern District of New York, and is not the basis for venue. Plaintiff is a male citizen of the United States.

2. The defendants herein, the City of New York and the New York County District Attorney's Office, are located at 100 Church Street, New York, New York 10007 and 1 Hogan Place, New York, New York 10013. Such locations fall under the jurisdiction of the Southern District of New York and are the basis for venue.

3. Defendants George Argyros and Nitin Savur, on information and belief, are employees of the City of New York and the New York County District Attorney's Office. Both defendants work at 1 Hogan Place, New York, New York 10013. George Argyros and Nitin Savur are listed in official capacity and individually pursuant to Count Three of this complaint.

4. This complaint alleges violations of various civil rights laws, including Title VII of the Civil Rights Act of 1964. The EEOC informed plaintiff of his right to sue in federal court on March 30, 2015. On this basis, plaintiff declares the venue to be the United States

District Courts, Southern District of New York. The District Courts have subject matter jurisdiction, as well as personal jurisdiction over parties. Succinctly, defendants violated Title VII by treating plaintiff differently than similarly situated employees with respect to the terms, conditions, and/or privileges of plaintiff's employment because of plaintiff's sex, male. These terms, conditions, and/or privileges extended to but are not limited to rules given to plaintiff, defendants' enforcement of workplace rules, and defendants' adherence or lack thereof to defendants' own policies. Defendants also retaliated against plaintiff for opposing defendants' unlawful employment practices by firing plaintiff. An Equal Employment Opportunity Commission dismissal was issued in March 2015, and thereafter, the United States District Court, Southern District of New York, earned jurisdiction.

### STATEMENT OF FACTS

5. Employees and/or past employees of the City of New York and or the New York County District Attorney's Office that have some knowledge regarding the allegations of this complaint include but are not limited to Nitin Savur, George Argyros, Ronit Zohar, Christopher Day, Penny Bedford, Crystal Munnerlyn, Linda Riede, Julia Soldatos, Monica Jenkins, Dionne Cooke, Annlee Bell, Rosemary Lawrence, Stephanie Gonzalez, Ruby Sanders, Erin Gray, Veronica Murano, Jamie Walsh, Siobhan Lyons, Liya Schmelzer, Renee Torres, Lois Shiffman, Danielle Iavaroni, Krista Curatolo, Desiree Dolce, Cherris Gralla, Jeanine Sandella, Theresa DiSilvestre, Laura McCarthy, Barbara Katechis, Jorge Sanchez, Louise Glover, Patricia Bailey, Ruben Henriquez.

6. Herein, the New York County District Attorney's Office may also be referred to as DANY.

7. On June 23, 2014, plaintiff began working for the New York County District Attorney's Office as a temporary grand jury stenographer.

8. Plaintiff was employed/paid by the City of New York.

9. The City of New York and the New York County District Attorney's Office were plaintiff's de jure and de facto employer.

10. Plaintiff worked in the grand jury stenographer unit with approximately twenty females and one other male. Grand jury stenographers working with the grand jury stenographer unit may also be referred to herein as coworkers or colleagues.

11. Grand jury stenographers are referred to as Reporter/Stenographers with regard to their civil service title.

12. Temporary grand jury stenographers are referred to as Community Associates with regard to their civil service title.

13. For all intents and purposes, temporary grand jury stenographers and grand jury stenographers are identical, similarly situated, receiving the same benefits, pay raises, terms and conditions of employment, and so on. The principal difference between a temporary grand jury stenographer and a grand jury stenographer is that temporary grand jury stenographers are at-will employees.

14. The supervisor of the grand jury stenographers unit was Linda Riede from June 2014 to February 2015.

15. On information and belief, Linda Riede was the primary decision maker with regard to hiring plaintiff.

16. The second in command of the grand jury stenographers unit was Julia Soldatos. Julia Soldatos would perform all supervisory functions when Linda Riede was absent, including but not limited to receiving EEO complaints.

17. In or around July 2014, Linda Riede explained very clearly to plaintiff that plaintiff was a temporary employee, and that plaintiff could be released from his employment at any time.

18. Based on representations made by Linda Riede, plaintiff could be employed for six months, or it could be longer, or it could be shorter, and it would depend on performance, hirings, transfer requests, and employees on maternity leave. Succinctly, plaintiff's employment depended on his performance and whether or not there were "slots" available.

19. The workplace boundaries of the grand jury stenographers unit were not very developed. Grand jury stenographers frequently joked/discussed/commented on issues of sexual/risqué/political/religious content. This includes but is not limited to an occasion where Desiree Dolce slapped Penny Bedford on the butt in summer 2014. This type of

behavior persisted from June 23, 2014 to February 4, 2015. This behavior was a privilege of employment, revocable at any time by defendants.

20. Stenographers acted in the manner described in the spirit of comradery and cohesion, and no offense was meant, taken, or expressed by any grand jury stenographer from June 23, 2014, to October 6, 2014.

21. In or around August 2014, a coworker named Krista Curatolo went out on maternity leave. This opened up a "slot." Linda Riede stated to plaintiff that she would not hire to replace Ms. Curatolo, so perhaps plaintiff could stay longer.

22. In or around August 2014, Linda Riede explained to plaintiff that the City of New York's test for grand jury stenographers wasn't given often, and at one point in the history of the grand jury stenographers, a lot of the grand jury stenographers were "temporary" or "provisional," and that a City of New York test was administered to protect their job.

23. In or around summer 2014, there was confusion as to whether Jamie Walsh was a permanent or temporary grand jury stenographer working for the grand jury stenographers unit.

24. On information and belief, it was decided that Jamie Walsh was a permanent grand jury stenographer.

25. On information and belief, had it been decided that Jamie Walsh was a temporary grand jury stenographer in summer 2014, Jamie Walsh would have been temporary for approximately four years as of summer 2014.

26. On information and belief, Jamie Walsh was temporary for approximately two years before becoming a permanent employee. Incident(s) described prove(s) that it was custom or practice for similarly situated temporary employees to be kept employed by the New York County District Attorney's Office and/or the City of New York for a period of two to four years.

27. On information and belief, coworkers witnessed friendly interactions between plaintiff and another coworker, Ronit Zohar, from June 23, 2014 to October 6, 2014. Ronit Zohar was plaintiff's female coworker.

28. Nitin Savur was appointed to be EEO Officer of the New York County District Attorney's Office in October 2014.

29. George Argyros was appointed to be EEO Coordinator of the New York County District Attorney's Office in October 2014.

30. On information and belief, by or before October 6, 2014, defendants were aware that Ronit Zohar was willing to lie about employment-related matters, including but not limited to an incident wherein Ronit Zohar told Erin Gray that Linda Riede stated Ronit Zohar could remain at DANY for as long as she wanted. On information and belief, Linda Riede made no such statement and was aware of Ronit Zohar's lie.

31. On information and belief, Ronit Zohar gave false information to defendants during an EEO investigation conducted by defendants, including but not limited to stating that Ronit Zohar was not friends with plaintiff and/or did not joke with plaintiff regularly.

32. On information and belief, on or about October 7, 2014, Ronit Zohar accused plaintiff of sexual harassment.

33. On information and belief, Ronit Zohar alleged that plaintiff made Ronit Zohar feel uncomfortable, unsafe, or offended.

34. On information and belief, Ronit Zohar made an EEO complaint against plaintiff.

35. On information and belief, Ronit Zohar made the EEO allegations of sexual harassment and/or discomfort, offense, or lack of safety on October 7, 2014, October 8, 2014, and October 9, 2014. Ronit Zohar made these allegations to Julia Soldatos, Linda Riede, George Argyros, and/or Nitin Savur. The allegations consisted of describing an internet joke or meme that plaintiff had shown Ronit Zohar via plaintiff's cellphone on September 30, 2014, at approximately 9:00 a.m.

36. Plaintiff was made aware of the allegations against plaintiff on October 17, 2014.

37. Prior to October 17, 2014, plaintiff had never met George Argyros.

38. But for Ronit Zohar's complaint, plaintiff would not have met George Argyros and George Argyros would not personally know plaintiff by name or face.

39. On October 17, 2014, defendants revealed the allegation made by Ronit Zohar against plaintiff to plaintiff. Plaintiff was made to feel guilty and foolish, and made to feel as though plaintiff had violated the EEO Policy of the City of New York.

40. At no time did defendants describe the allegations against plaintiff as sexual harassment.

41. On information and belief, defendants discriminated against plaintiff in investigatory/disciplinary procedures because of plaintiff's sex. Defendants spoke to

defendant more harshly and in a more accusatory manner because of plaintiff's sex, including but not limited to asking plaintiff if plaintiff was aware that there was an entire unit related to sex crimes and human trafficking. Defendants discriminated against plaintiff with respect to the terms, conditions, and/or privileges of plaintiff's employment because of plaintiff's sex.

42. By or before October 20, 2014, plaintiff provided evidence which, by defendants' own policies, showed that plaintiff's conduct had not violated the EEO policies of the New York County District Attorney's Office. This evidence included but was not limited to showing defendants text messages between Ronit Zohar and plaintiff from September 30, 2014, and showing defendants the cellphone that was used on September 30, 2014. Succinctly, to violate the EEO policies of defendants, plaintiff would have had to participate in conduct that had the purpose or effect of unreasonably interfering with Ronit Zohar's work performance, or creating an intimidating, hostile, or offensive working environment. The nature of the evidence plaintiff provided defendants showed that plaintiff had not unreasonably interfered with Ronit Zohar's work performance or created an intimidating, hostile, or offensive working environment.

43. Defendants conducted an investigation into the allegations made by Ronit Zohar, and on information and belief, in October 2014, discovered evidence that, by defendants' own policies, showed that plaintiff's conduct had not violated the EEO policies of the New York County District Attorney's Office. This evidence includes but is not limited to Penny Bedford's statements that Ronit Zohar was extremely friendly with plaintiff prior to October 9, 2014. On information and belief, Penny Bedford revealed information about plaintiff's ex-girlfriend, Terica Evans, and stated that "maybe [Ronit Zohar] found out she was not [plaintiff's] type."

44. On information and belief, in October 2014, defendants found evidence that Ronit Zohar had violated the EEO Policies of the New York County District Attorney's Office. Succinctly, the grand jury stenographers unit constantly joked in a risqué manner, such joking was a de facto practice at the grand jury stenographers unit. EEO policies of the New York County District Attorney's Office state the office's intention to ensure all aspects of employment policies and practices are administered without regard to gender. Evidence showed that Ronit Zohar complained because plaintiff was male, not because

Ronit Zohar's work performance was interfered with or because Ronit Zohar was in an intimidating, hostile, or offensive working environment. Succinctly, Ronit Zohar's complaint was an attempt to discriminate against plaintiff because of plaintiff's gender with respect to a practice of employment. Defendants, by policy, ensured employment practices that were administered without regard to gender for similarly situated employees. Defendants did not ensure anything for plaintiff, and therefore discriminated against plaintiff with respect to the terms, conditions, and/or privileges of plaintiff's employment.

45. On October 29, 2014, plaintiff wrote defendants with regard to the EEO policy of the City of New York, and notified defendants that plaintiff did not believe the complaint fell under the EEO policy of the City of New York. Plaintiff requested that defendants provide the EEO policy of the New York County District Attorney's Office to plaintiff.

46. At no time did defendants refer plaintiff to the actual EEO policy of the New York County District Attorney's Office.

47. At no time did defendants explain the actual EEO policy of the New York County District Attorney's Office.

48. Defendants were, pursuant to defendants' own policies, responsible for referring plaintiff to the EEO policy of the New York County District Attorney's Office, and as part of ongoing discrimination against plaintiff because of sex, failed to direct plaintiff to the EEO policy of the New York County District Attorney's Office.

49. On October 30, 2014, defendants declared that plaintiff acted with no malice towards Ronit Zohar.

50. After October 30, 2014, defendants allowed Ronit Zohar to have special seating and scheduling privileges. Such privileges for Ronit Zohar adversely affected the terms, conditions, and/or privileges of plaintiff's employment, and supported the notion that plaintiff had done something wrong.

51. Defendants, through discrimination against plaintiff because of plaintiff's sex, caused plaintiff's coworkers to treat plaintiff differently than they would have otherwise, effectively discriminating against plaintiff with respect to the terms, conditions, and/or privileges of plaintiff's employment because of plaintiff's sex by keeping plaintiff in an

awkward, uncomfortable environment where plaintiff was assumed to have violated defendants' EEO policies.

52. Defendants discriminated against plaintiff with respect to the terms, conditions, and/or privileges of plaintiff's employment because of plaintiff's sex by failing to follow defendants' own policies, dismiss the EEO complaint, and notify plaintiff and Ronit Zohar of defendants' decisions.

53. In October 2014, defendants urged plaintiff to avoid discussing the complaint with coworkers.

54. In October 2014, on information and belief, defendants gave Ronit Zohar no similar instructions, treating plaintiff and Ronit Zohar differently because of sex.

55. Defendants violated several of defendants' own policies, avoided resolution of the conflict at every step, and refused to acknowledge that Ronit Zohar's complaint did not fall under the EEO policies of the City of New York. Despite declaring plaintiff had acted without malice, defendants continued to treat plaintiff as if plaintiff had violated EEO policies and discriminated against plaintiff because of sex with respect to plaintiff's terms, conditions, and/or privileges of employment.

56. Defendants violated several of defendants' own policies, avoided resolution of the conflict at every step, and refused to acknowledge that Ronit Zohar's complaint did not fall under the EEO policies of the New York County District Attorney's Office, effectively discriminating against plaintiff because of plaintiff's sex with respect to plaintiff's terms, conditions, and/or privileges of employment.

57. Defendants are alleged to have violated multiple of defendants' own policies, including but not limited to the failure to request a conference between directly concerned parties to discuss defendants' findings report and determine if resolution was possible without further proceedings. Such failure to follow policy was discriminatory against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

58. Plaintiff asserts that defendants' violations of defendants' own policies was a discriminatory application or misapplication of sex-neutral rules. Such application/misapplication of rules was ongoing, willful, malicious, and/or discriminatory

because of plaintiff's sex, and adversely affected the terms conditions, and/or privileges of plaintiff's employment.

59. On October 30, 2014, plaintiff complained to Linda Riede that plaintiff felt plaintiff was on a different set of rules from female coworkers, that there was a lot of inappropriate workplace conduct, and that coworkers could joke about whatever coworkers wanted to joke about, and plaintiff had to watch his back.

60. Linda Riede stated that that wasn't right, that the plaintiff shouldn't feel like he has to walk on eggshells, and that the grand jury stenographers had had men in the past that joked. Plaintiff asserts that such statements prove that Nitin Savur and George Argyros were, in fact, overstepping authority in order to discriminate against plaintiff because of plaintiff's sex with respect to terms, conditions, and/or privileges of plaintiff's employment.

61. On or about November 6, 2014, Linda Riede was separated from the investigation and EEO complaints. Linda Riede was told that she could not discuss EEO matters with plaintiff. Plaintiff was told he could not discuss EEO matters with Linda Riede. Such new terms and conditions were a violation of defendants' own policies, and part of defendants' ongoing discrimination against plaintiff because of plaintiff's sex with respect to terms, conditions, and/or privileges of plaintiff's employment.

62. Defendants violated defendants' own policies by failing to train Linda Riede in EEO matters. Such conduct was a part of defendants' discrimination against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment. Succinctly, on information and belief, Linda Riede would have opposed defendants' discrimination and retaliation against plaintiff if Linda Riede had been properly trained with regard to EEO matters.

63. Defendants violated defendants' own policies by failing to instruct Linda Riede to explain EEO policies to staff. Such conduct was part of defendants' discrimination against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment. Succinctly, if plaintiff and/or coworkers were fully aware of EEO policies, on information and belief, plaintiff and/or coworkers would have opposed defendants' discrimination and retaliation against plaintiff.

64. Defendants violated defendants' own policies by failing to make certain the EEO policy statement was prominently displayed in plaintiff's work area. Such conduct was part of defendants' discrimination against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment. Succinctly, if the EEO policy statement was prominently displayed, on information and belief, plaintiff and/or coworkers would have opposed defendants' discrimination and retaliation against plaintiff.

65. On November 5, 2014, Ronit Zohar made several malicious, slanderous statements about plaintiff to coworkers including but not limited to Jeanine Sandella, Renee Torres, Theresa DiSilvestre, and Erin Gray.

66. On November 5, 2014, Ronit Zohar stated that plaintiff was a stalker.

67. On November 5, 2014, Ronit Zohar stated that plaintiff had encroached on Ronit Zohar's life.

68. On November 5, 2014, Ronit Zohar associated plaintiff's name with rape culture.

69. On November 7, 2014, plaintiff made defendants aware of Ronit Zohar's conduct.

70. On November 7, 2014, plaintiff raised concerns that Ronit Zohar's EEO complaint had been in bad faith.

71. On November 7, 2014, plaintiff raised concerns that Ronit Zohar had not filed her complaint until after plaintiff had got a new girlfriend.

72. On November 7, 2014, plaintiff raised concerns that defendants should consider how defendants would have treated plaintiff if plaintiff had acted in the manner that Ronit Zohar had acted. Specifically, plaintiff asked defendants to consider how defendants would treat plaintiff if plaintiff went to coworkers and discussed the complaint and/or called Ronit Zohar horrible names.

73. On November 7, 2014, plaintiff raised concerns that his actions had not been different from the actions of any other coworker in the grand jury stenographers unit.

74. By or before November 7, 2014, defendants were wholly aware that defendants' conduct was discriminating against plaintiff because of sex with respect to the terms, conditions, and/or privileges of plaintiff's employment. On information and belief, defendants took action to avoid the appearance of discrimination, specifically a private discussion with Ronit Zohar. Such disciplinary procedures with unequal because of plaintiff's sex, and

therefore, defendants discriminated against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

75. On November 7, 2014, defendants gave plaintiff a special set of rules, and altered the effective terms and conditions of his employment. Defendants stated that such rules were expected of everyone at the office and in the unit. In fact, such rules were not expected of anyone except for plaintiff. Through such rules, defendants discriminated against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment. Hereinafter, such rules are described, and it is plaintiff's assertion that such rules were only given and/or would be enforced because of plaintiff's sex, male.

76. On November 7, 2014, defendants encouraged plaintiff not to act awkward or different in light of the EEO complaint, and to treat Ronit Zohar in the same respectful manner plaintiff would treat other coworkers. On information and belief, Ronit Zohar was given no similar instruction.

77. Defendants were wholly aware of plaintiff's efforts to follow instructions, and wholly aware of Ronit Zohar's campaign to create an awkward, uncomfortable work environment. Defendants discriminated against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

78. On November 7, 2014, plaintiff was told by defendants not to discuss relationships around the workplace.

79. On November 7, 2014, plaintiff was told by defendants that his friendship with coworkers ended when he came in the door to work.

80. On November 7, 2014, plaintiff was told by defendants that he should treat everything he does like it may end up in a newspaper.

81. On November 7, 2014, plaintiff was told by defendants one should evaluate the culture of an organization, decide if they fit in, and if not, move on.

82. On November 7, 2014 plaintiff was told by defendants that he should act in such a manner that he could never be questioned.

83. On November 7, 2014, plaintiff was told by defendants to avoid conversations about religion.

84. On November 7, 2014, plaintiff was told by defendants to avoid conversations about personal finance.

85. On November 7, 2014, plaintiff was told by defendants to avoid conversations about Ronit Zohar.

86. On November 7, 2014, plaintiff was told by defendants that office humor is risky.

87. On November 7, 2014, plaintiff was told by defendants not to retaliate against Ronit Zohar.

88. At no time did plaintiff retaliate against Ronit Zohar. In fact, plaintiff encouraged coworkers to follow defendants' policies and avoid retaliating against Ronit Zohar.

89. On November 7, 2014, defendants offered Lifescope EAP services to plaintiff, suggesting plaintiff see a psychologist for his own well-being. Plaintiff did not, at that time, utilize Lifescope EAP. In light of all evidence, such conduct was an attempt to trivialize plaintiff's concerns with regard to disparate treatment, and dissuade plaintiff from opposing unlawful employment practices.

90. Plaintiff's female coworkers were not held to the same standard or given the same instructions with regard to retaliation against Ronit Zohar. Defendants, through their consistent failure to hold employees of different sex to the same standard, and through their consistent effort to hold employees of male sex to a higher standard, discriminated against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

91. Plaintiff's female coworkers were not given the same rules or instructions with regard to behavior, office friendships, appropriate discussions, or joking.  Defendants, through their consistent failure to hold employees of different sex to the same standard, and through their consistent effort to hold employees of male sex to a higher standard, discriminated against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

92. Plaintiff was made to feel alienated from and fearful of his coworkers. Defendants had displayed a willingness to take a bad faith complaint and discriminate against plaintiff because of plaintiff's sex with respect to terms, conditions, and/or privileges of plaintiff's employment. Despite an alienating environment, plaintiff made every effort to conduct himself in a manner that facilitated productivity and cohesiveness.

93. Defendants told plaintiff that they were as committed to plaintiff's concerns as any other complainant. Despite this representation, defendants' actions were, at all times, geared

towards minimizing plaintiff's concerns and creating an environment where plaintiff would feel uncomfortable reporting unlawful employment practices. Defendants' attempts to create the illusion of equality lulled plaintiff into a false sense of security, wherein plaintiff believed and wanted to believe that defendants' conduct was not unlawful and did not violate EEO policies.

94. Ronit Zohar continued to antagonize the plaintiff and create an atmosphere of awkwardness and hostility.

95. On information and belief, on December 19, 2014, defendants failed to follow defendants' own policies, including but not limited to defendants' requirement to receive any EEO complaint made by a member of [the] office. Plaintiff was, at that time, a member of the office. Defendants did, on at least one prior occasion, receive Ronit Zohar's EEO complaint(s). Defendants failed to receive plaintiff's EEO complaint and deal with it in the manner prescribed by the EEO policies of the New York County District Attorney's Office. Such failure to follow defendants' own policies was discriminatory against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

96. On December 19, 2014, plaintiff made defendants aware of the atmosphere of awkwardness and hostility generated by Ronit Zohar.

97. On December 19, 2014, plaintiff made defendants aware that he was concerned about defendants' investigatory neutrality.

98. On December 19, 2014, plaintiff made defendants aware that he was on a different set of rules from female coworkers, including but not limited to Ronit Zohar.

99. On December 19, 2014, plaintiff made defendants aware that he did not feel equal to coworkers.

100. On December 19, 2014, plaintiff made defendants aware that he was under immense pressure, and functioning despite that pressure.

101. On December 19, 2014, defendants explained to plaintiff that despite plaintiff's good-faith belief, one of his complaints regarding a coworker discussing men and politics did not necessarily fall under EEO policies. Defendants, beyond any reasonable doubt, were adept at identifying EEO and non-EEO matters, and despite that, continuously

discriminated against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

102.    On December 19, 2014, defendants were hostile towards plaintiff, utilizing words like dumb, delusional, you kept your job, oversensitive, and gathering ammunition.

103.    On information and belief, defendants never used such words against any female complainant, and therefore discriminated against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment. Plaintiff alleges it is a privilege of employment not to be accused of being oversensitive when bringing an EEO complaint to defendants.

104.    On December 19, 2014, defendants violated several of defendants' own policies, including but not limited to failing to prepare, with the complainant, a written report detailing specific allegations of the alleged discriminatory practices. Such failure to follow policy by defendants was discriminatory against plaintiff because of plaintiff's sex with respect to plaintiff's terms, conditions, and/or privileges of employment.

105.    On December 19, 2014, upon seeing plaintiff's dissatisfaction with defendants' behavior, defendants' attitude became kinder.

106.    On December 19, 2014, defendants urged plaintiff to trust the EEO process.

107.    On December 19, 2014, defendants told plaintiff that plaintiff could request a transfer.

108.    On December 19, 2014, upon learning of plaintiff's dissatisfaction with the suggestion of a transfer, defendants offered to conduct a unit training to address plaintiff's concerns. Defendants also offered plaintiff a few days off of work, paid for by defendants.

109.    Plaintiff was content with the resolution of a unit training to address unit behavior and some days off, and accepted that resolution.

110.    Had such a unit training been held, and had coworkers been provided with the same training, rules, terms, conditions, and/or privileges of employment as plaintiff, such training would have resolved all discrimination against plaintiff.

111.    On December 19, 2014, defendants urged plaintiff to utilize Lifescope EAP to see a psychologist. Plaintiff complied. Plaintiff would have never needed or wanted to see a psychologist but for defendants' discrimination against plaintiff because of plaintiff's sex.

112.     On December 19, 2014, defendants insinuated multiple times that something was wrong with plaintiff or plaintiff's perception of reality, causing severe mental anguish.

113.     Defendants' insinuations that something was wrong with plaintiff or plaintiff's perception of reality were discriminatory against plaintiff because of sex with respect to the terms, conditions, and/or privileges of plaintiff's employment. On information and belief, defendants never insinuated something was wrong with a female complainant's perception of reality, and it was a privilege of employment to have an EEO Officer that would not make insinuations about a complainant's perception of reality during an EEO complaint.

114.     No unit training was ever held prior to February 6, 2015.

115.     The behavior of the grand jury stenographers unit never changed.

116.     On information and belief, defendants did not hold a unit training because defendants knew, by law and defendants' own policies, that the behavior of the grand jury stenographers unit did not violate EEO policies. However, defendants could not admit that without admitting that plaintiff had, at no time, violated any city, state, federal law, or without admitting that plaintiff had not violated EEO policies of the City of New York or the New York County District Attorney's Office. Defendants' failure to train similarly situated employees of different sex equally, and hold similarly situated employees of different sex to the same terms, conditions, and/or privileges of employment was discrimination against plaintiff because of plaintiff's sex with respect to the terms, conditions, and/or privileges of plaintiff's employment.

117.     On February 2, 2015, defendants informed plaintiff his last day at the New York County District Attorney's Office would be February 6, 2015.

118.     On information and belief, George Argyros was the primary decision maker in firing plaintiff and/or releasing plaintiff from plaintiff's employment.

119.     On information and belief, Julia Soldatos did not have the ability to hire or fire employees.

120.     Julia Soldatos signed off on plaintiff's release on February 4, 2015.

121.     Plaintiff's last day as an employee for defendants was February 4, 2015. Plaintiff continued to receive payments from defendants until March 2015.

122.     The stated reason for plaintiff's release from employment was because plaintiff was temporary and just had to be let go.

123.     The news of plaintiff's release and stated reason for plaintiff's release was conveyed to plaintiff on February 2, 2015 by George Argyros.

124.     Defendants raised no objection and in fact supported plaintiff's decision to take leave from February 4, 2015, to February 6, 2015.

125.     "Slots" were available and there were absolutely no problems with plaintiff's job performance except for problems arising out of defendants' discrimination against plaintiff because of plaintiff's sex and because plaintiff had opposed unlawful employment practices. On information and belief, plaintiff was fired under false pretense for opposing the unlawful employment practices of defendants. Succinctly, plaintiff was retaliated against by defendants. Succinctly, but for plaintiff's complaint/opposition to unlawful employment practices of defendants, defendants would not have fired plaintiff or released plaintiff from employment.

126.     On information and belief, similarly situated temporary grand jury stenographers that did not oppose discrimination tended not to be released from employment because they just had to let him go.

127.     All prerequisites required to bring this lawsuit have been met.

128.     On information and belief, the Equal Employment Opportunity Commission, EEOC, informed the New York County District Attorney's Office of plaintiff's discrimination claim in February 2015.

129.     On information and belief, despite plaintiff's statements to EEOC Investigator Paul Young, at no time did the EEOC inform the City of New York of plaintiff's discrimination claim.

130.     The Equal Employment Opportunity Commission, EEOC, issued plaintiff a dismissal letter and notice of right to sue on March 16, 2015. Plaintiff received such notice on March 30, 2015. Such notice states, in part: [Dismissal] does not certify that [defendants are] in compliance with the statutes. Succinctly, the EEOC's dismissal does not certify that defendants did not discriminate against plaintiff because of plaintiff's sex or retaliate against plaintiff because of plaintiff's opposition to unlawful employment practices.

131.    Plaintiff was interviewed at a 50-h hearing by Billig Law on behalf of the City of New York on May 1, 2015.

132.    Plaintiff was provided with his hearing transcript on May 30, 2015.

133.    Plaintiff returned the executed transcript, errata, objections, and documents requested to the City of New York on or about June 1, 2015.

134.    At no time did the EEOC attempt to conduct pre-suit conciliation.

135.    The plaintiff attempted to communicate with the defendants and conduct pre-suit conciliation in May 2015. Defendants did not indicate any interest whatsoever in pre-suit conciliation despite the great weight of the evidence.

136.    Plaintiff experienced extreme mental anguish from November 2014 to February 2015 due to the defendants' discriminatory conduct.

137.    Plaintiff continues to experience mental anguish due to defendants' unlawful conduct for as long as the truth goes unsung.

138.    On March 19, 2015, plaintiff filed a slander lawsuit against Ronit Zohar in the Supreme Court of the State of New York, County of Richmond 150234/2015. Such slander lawsuit shares facts and circumstances with this action. Defendants are not alleged to be liable for damage resulting from Ronit Zohar's actions.

139.    By or before June 8, 2015, on information and belief, Ronit Zohar failed to answer plaintiff's verified complaint in case 150234/2015, thereby admitting allegations of slander and defamation per se under New York Law.

140.    Defendants were wholly aware of Ronit Zohar's slander, and through defendants' discrimination against plaintiff because of plaintiff's sex, supported the slanderous assertions of fact made by Ronit Zohar in October 2014 and November 2014, specifically regarding but not limited to harassment, stalking, and rape culture.

141.    Attached hereto as Plaintiff's Exhibit 1 is the EEO Policy of the City of New York. Attached hereto as Plaintiff's Exhibit 2 is the 2009 New York County District Attorney's Office Support Staff Manual. Attached hereto as Plaintiff's Exhibit 3 are the EEO policies of the New York County District Attorney's Office. Attached hereto as Plaintiff's Exhibit 4 is the EEOC's dismissal and notice of right to sue.

142.    Plaintiff's Exhibits 2 and 3 constitute all the rules that should have governed defendants in their response to the EEO complaints made by Ronit Zohar and plaintiff.

143.     Defendants' discrimination against plaintiff violated rules found in Plaintiff's
         Exhibits 2 and 3.

144.     On information and belief, the procedure and outcome of the matters described
         herein, plaintiff's effective terms and conditions of employment, disciplinary procedures,
         work environment, defendants' adherence or lack thereof to defendants' own policies, and
         all disparate treatment was to plaintiff's detriment. Plaintiff alleges discrimination against
         plaintiff because of sex with respect to the terms, conditions, and/or privileges of
         plaintiff's employment.

145.     On information and belief, defendants continuously, willfully, maliciously and/or
         discriminately, under color of law, statute, ordinance, regulation, custom, or usage, of
         State/States/Territories subjected plaintiff or caused plaintiff, a citizen of the United
         States, to be subjected to deprivation of rights, privileges, or immunities secured by the
         Constitution and laws.

## CLAIMS AND CAUSES OF ACTION

## COUNT ONE - SEX DISCRIMINATION

146.     Plaintiff asserts that defendants violated Title VII of the Civil Rights Act of 1964,
         USC 42, § 2000e.

147.     Defendants were plaintiff's employer under the Civil Rights Act of 1964.

148.     Defendants discriminated against plaintiff with respect to terms, conditions,
         and/or privileges of employment because of plaintiff's sex, male.

149.     Plaintiff asserts that defendants violated defendants' own policies in order to
         discriminate against plaintiff because of plaintiff's sex with respect to the terms,
         conditions, and/or privileges of plaintiff's employment.

150.     Plaintiff asserts that by treating plaintiff differently during disciplinary/complaint
         procedures because of plaintiff's sex in October 2014 and November 2014, defendants
         violated Title VII.

151.     Plaintiff asserts that by treating plaintiff differently during disciplinary/complaint
         procedures because of plaintiff's sex in December 2014, defendants violated Title VII.

152.     Plaintiff asserts that by taking EEO complaints made by similarly situated female employees more seriously than EEO complaints made by similarly situated male employees, defendants violated Title VII.

153.     Plaintiff asserts that conduct of defendants was discriminatory against plaintiff because of plaintiff's sex with respect to terms, conditions, and/or privileges of plaintiff's employment.

154.     On information and belief, defendants follow a no-tolerance policy with regard to sexual harassment. Such policy should be denounced as discriminatory against males. On information and belief, zero tolerance sexual harassment policies disproportionally adversely impact male employees.

155.     Defendants should be held liable for compensatory damages, front pay, punitive damages, and attorney's fees. Plaintiff asks for declaratory relief.

## COUNT TWO - RETALIATION

156.     Plaintiff asserts that defendants violated Title VII of the Civil Rights Act of 1964.

157.     Defendants were plaintiff's employer under the Civil Rights Act of 1964.

158.     Defendants discriminated against plaintiff with respect to terms, conditions, or privileges of employment because of plaintiff's sex.

159.     Plaintiff opposed discrimination and unlawful employment practice by complaining to defendants on October 30, 2014, November 7, 2014, and especially December 19, 2014.

160.     Defendants fired plaintiff under false pretense. Succinctly, similarly situated employees of defendants were treated differently due to sex. Plaintiff asserts that such disparate treatment was on the basis of plaintiff's opposition to discriminatory workplace practices, and had plaintiff not opposed discriminatory workplace practices, plaintiff would not have been fired when plaintiff was fired.

161.     On information and belief, plaintiff would have remained at the New York County District Attorney's Office for a period of two to four years from hiring.

162.     Defendants retaliated and/or discriminated against plaintiff by firing plaintiff for opposing unlawful employment practices.

163.    Defendants should be held liable for compensatory damages, front pay, punitive damages, and attorney's fees. Plaintiff asks for declaratory relief.

## COUNT THREE - CIVIL ACTION FOR DEPRIVATION OF RIGHTS

164.    Pursuant to USC 42 § 1983 - Deprivation of Rights, Nitin Savur and George Argyros are persons who, under color of a statute of the United States, subjected plaintiff or caused plaintiff to be subjected to deprivation of plaintiff's right or privilege not to be discriminated against because of sex with respect to terms, conditions, and/or privileges of plaintiff's employment. Nitin Savur and George Argyros shall be liable to the plaintiff, injured by their actions, and are named herein within official capacity and individually.

165.    Pursuant to USC 42, § 1983 - Deprivation of Rights, George Argyros is a person who, under color of a statute of the United States, subjected plaintiff or caused plaintiff to be subjected to deprivation of plaintiff's right or privilege not to be discriminated and/or retaliated against for opposing unlawful employment practices. George Argyros shall be liable to the plaintiff, injured by George Argyros's actions, and is named herein within official capacity and individually.

166.    Defendants should be liable for compensatory damages, punitive damages, and attorney's fees. Plaintiff asks for declaratory relief.

## COUNT FOUR - STATE AND CITY VIOLATIONS OF LAW

167.    Under the New York City Human Rights Law, also known as § 8-101 of the Administrative Code of the City of New York and related sections, it is stated that the council hereby finds and declares that prejudice, intolerance, bigotry, and discrimination and disorder occasioned thereby threaten the rights and privileges of [the City of New York's] inhabitants, and menace the institutions and foundation of a free democratic state.

168.    Under the New York State Constitution, plaintiff is entitled to equal protection of laws, and discrimination in civil rights is prohibited.

169.    Under the New York State Human Rights Law, also known as New York Executive Law § 290 and § 291, plaintiff is declared to have a civil right to obtain employment without discrimination because of sex.

170.    Plaintiff begs the Court to acknowledge and uphold the spirit of all applicable law, and denounce discrimination against plaintiff because of plaintiff's sex. Plaintiff

20

asserts that defendants' actions and ultra vires acts under color of law denied plaintiff rights/privileges granted by the State of New York and the City of New York. Plaintiff asks for declaratory relief.

## COUNT FIVE - STATE TORTS

171.     Pursuant to all facts and circumstances, plaintiff claims defendants have committed ultra vires acts under color of law.

172.     Pursuant to all facts and circumstances, plaintiff claims defendants have committed the tort intentional infliction of emotional distress.

173.     Pursuant to all facts and circumstances, plaintiff claims defendants have committed the tort negligent infliction of emotional distress.

174.     Pursuant to all facts and circumstances, plaintiff asserts defendants are liable for compensatory damages, punitive damages, and attorney's fees.

175.     Defendants' failure to comply with Title VII of the Civil Rights Act of 1964 and defendants' own policies gave weight to the slanderous statements made by Ronit Zohar. Succinctly, defendants' discrimination against plaintiff because of sex supported slanderous statements made by Ronit Zohar.

176.     Plaintiff asks for declaratory relief.

## REMEDY REQUESTED

177.     The proximate cause of plaintiff's ongoing mental anguish is defendants' failure to promptly admit discrimination and retaliation. Plaintiff asserts that a full, immediate, written, public admission by defendants of defendants' conduct would go a long way to make plaintiff whole, and if defendants were to act so honorably, admirably, and honestly, plaintiff could wholly retract claims of malice, and would willingly absorb the vast majority of damage caused by defendants' discriminatory conduct.

178.     Plaintiff requests the court order defendants not to utilize bad faith EEO complaints as an excuse to violate Title VII.

179.     Plaintiff requests the court declare that zero tolerance policies against sexual harassment disproportionately adversely impact male employees, and are therefore unlawful.

180.      WHEREFORE, in the absence of such immediate admission, plaintiff respectfully requests the Court to declare that defendants did, in fact, unlawfully discriminate and retaliate against plaintiff and/or award plaintiff with a judgment in favor of plaintiff, against defendants, for a total of $400,000 for all damage and mental anguish caused by defendants' unlawful conduct.

DATED: JUNE 8, 2015

CHRISTOPHER DAY
423 Guyon Avenue
Staten Island, NY 10306
917 685 3010
ChristopherDay227@gmail.com

# EQUAL EMPLOYMENT OPPORTUNITY

## P O L I C Y

### STANDARDS AND PROCEDURES
### TO BE UTILIZED BY CITY AGENCIES

### CITY OF NEW YORK

### 2014

PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

# EQUAL
# EMPLOYMENT
# OPPORTUNITY

# POLICY

## STANDARDS AND PROCEDURES
## TO BE UTILIZED BY CITY AGENCIES

## CITY OF NEW YORK

BILL DE BLASIO
Mayor

STACEY CUMBERBATCH
Commissioner
Department of Citywide Administrative Services

## 2014

# NEW YORK CITY
## EQUAL EMPLOYMENT OPPORTUNITY POLICY

### TABLE OF CONTENTS

| | | |
|---|---|---|
| **INTRODUCTION** | | 1 |
| **I.** | **EQUAL EMPLOYMENT OPPORTUNITY POLICY** | 2 |
| | A. Types of Prohibited Conduct | 2 |
| | B. Applicability | 3 |
| **II.** | **SPECIFIC PROTECTIONS** | 4 |
| | A. Sexual Harassment | 5 |
| | B. Disabilities | 5 |
| | C. Religion | 6 |
| | D. Retaliation | 6 |
| | E. Domestic Violence, Sexual Offenses, or Stalking | 7 |
| **III.** | **PROCEDURES** | 7 |
| | A. Reporting Violations | 7 |
| | B. Contact with the EEO Office | 8 |
| | C. Withdrawing Complaints | 9 |
| | D. Mediation | 9 |
| | E. Concluding the Complaint Investigation | 10 |
| | F. Other Places Where Complaints May Be Filed | 10 |
| | G. Requests for Reasonable Accommodations | 11 |
| | 1. Disabilities | 12 |
| | 2. Religious Accommodations | 12 |
| | 3. Victims of Domestic Violence, Sexual Offenses, or Stalking | 13 |
| | 4. Pregnancy | 13 |
| | H. Confidentiality | 14 |
| | I. Documentation | 14 |
| | J. Additional Sources of Procedural Information | 15 |

IV.     AGENCY SPECIFIC DIVERSITY AND EEO PLANS          15-19

V.      ENFORCEMENT AND ACCOUNTABILITY STANDARDS        19

        A.      Department of Citywide Administrative Services     19
        B.      Agency Heads                                       20
        C.      EEO Officers                                       22
        D.      Agency General Counsels                            22
        E.      Managers and Supervisors                          22
        F.      Personnel Officers                                 23

# NEW YORK CITY EQUAL EMPLOYMENT OPPORTUNITY POLICY (2014)

## Introduction

The New York City Charter provides that each agency head must ensure that his or her agency does not discriminate against employees or applicants for employment in any manner prohibited by federal, state, and local law.[1]  In addition, the Charter requires agency heads to establish measures, programs, and annual EEO Plans that communicate each agency's efforts to provide equal employment opportunity ("EEO") to City employees and applicants for employment within City government.[2]  The Department of Citywide Administrative Services ("DCAS") is required to establish uniform procedures and standards to assist City agencies in establishing annual EEO Plans, and other measures and programs to ensure equal employment opportunity.[3]  DCAS developed this Policy,[4] and the standards and procedures contained herein, to implement DCAS' and the City's obligations under the City Charter; federal, state, and local laws; and the City's diversity and inclusion strategy.

The *Equal Employment Opportunity Policy (2014)*, hereafter known as "Policy," supersedes the previous *Equal Employment Opportunity Policy (2005)* of the City of New York.  Detailed uniform complaint and reasonable accommodation procedures are published separately.  This Policy, any addenda to this Policy, and the EEO Policy Handbook are to be distributed to each agency head, EEO Officer,[5] General Counsel, Agency Personnel Officer (APO), manager, and supervisor.

In addition to the Policy, DCAS updated the EEO Policy Handbook, *"About EEO: What You May Not Know."*[6]  The EEO Policy Handbook was created to provide City government employees with a user-friendly summary of the relevant laws and the Policy.

---

[1] See Charter Section 815(h).
[2] See Charter Section 815(a)(19).
[3] See Charter Section 814(a)(12).
[4] This Policy was drafted in consultation with the Equal Employment Practices Commission, the New York City Law Department and EEO Officers from various City agencies.
[5] Each agency head appoints an EEO Officer to assist with the implementation of the Policy, standards, and procedures.  The agency EEO Officer and other personnel, including EEO counselors, investigators, liaisons, etc., are referred to in this Policy as 'EEO office or EEO representatives.'
[6] The Policy may be downloaded at http://www.nyc.gov/html/dcas/html/about/eeopol.  The EEO Policy Handbook, *"About EEO: What You May Not Know,"* may be downloaded at http://www.nyc.gov/html/dcas/html/about/eeo_booklet.shtml.

## I.      Equal Employment Opportunity Policy

The City of New York is an equal opportunity employer and prohibits discriminatory employment actions against, and treatment of, City employees and applicants for employment based on actual or perceived race, color, national origin, alienage or citizenship status, religion or creed, gender (including "gender identity" -- which refers to a person's actual or perceived sex, and includes self-image, appearance, behavior or expression, whether or not different from that traditionally associated with the legal sex assigned to the person at birth), disability, age (18 and over), military status, prior record of arrest or conviction,[7] marital status, partnership status,[8] genetic information or predisposing genetic characteristic,[9] sexual orientation, status as a victim or witness of domestic violence, sex offenses or stalking,[10] and unemployment status.[11]

## A.      Types of Prohibited Conduct[12]

Decisions and practices based on an individual's protected status (e.g., race, religion, age, and the other categories listed above) that unlawfully affect employment or the compensation, terms, conditions, or privileges of an individual's employment or potential employment with the City of New York are prohibited by this Policy. This includes unlawful decisions, actions, and practices that occur in the course of recruitment, testing, hiring, work assignments, salary and benefits, working conditions, performance evaluations, promotions, training opportunities, career development and advancement, transfers, discipline, discharge, or any other application or selection process relating to employment.

---

[7] Some employment actions motivated by the reasons listed are permitted by law, such as where an employer may deny employment on the basis of an applicant's prior record of conviction, if there is a direct relationship between one or more of the applicant's criminal offenses and the specific employment sought, or where employing the applicant poses an unreasonable risk to property or to the safety or welfare of specific individuals or the general public. (*See* Correction Law, Art. 23-A, Section 752.)

[8] "Partnership status" was added as a protected class under New York City's Human Rights Law on October 3, 2005.

[9] The term "predisposing genetic characteristic" was adopted on August 30, 2005 to streamline the terms "genetic predisposition" and "carrier status" in the previous version of the New York State Human Rights Law.

[10] "Status as victim of sex offenses or stalking" was added as a protected class under the City Human Rights Law on December 22, 2003.

[11] "Unemployment status" was added as a protected class under New York City's Human Rights Law on June 11, 2013.

[12] See also, EEO Policy Handbook· *"About EEO: What you May Not Know,"* for more examples of prohibited conduct.

The Policy also prohibits sexual harassment (i.e., conduct or language of a sexual nature) and harassment based on gender or any other protected characteristic (such as race, religion, disability, or sexual orientation).  Forms of harassment may include, but are not limited to, the use of vulgar language, abusive acts or language, hostility, physical aggression, intimidation, or unequal treatment.

The Policy prohibits conduct which unreasonably interferes with an employee's job performance or creates an intimidating, hostile, or offensive working environment, or creates an abusive working environment based on any protected characteristic.

Harassment and/or retaliation against a person who opposes or complains about prohibited conduct or participates in any way in the complaint, investigation, or reasonable accommodation processes are strictly prohibited.

The Policy also prohibits the denial of reasonable accommodations for disabilities; pregnancy, childbirth, and related medical conditions; religious beliefs, observances, and practices; or for victims of domestic violence, sex offenses, or stalking that do not create an undue hardship.

Some offensive acts or remarks may violate this Policy even if they are not so severe that they violate federal, state, or local discrimination laws.  The City and its agencies may discipline conduct that violates this Policy even if the conduct does not violate a law prohibiting discrimination.

The Policy also prohibits any City employee from aiding, abetting, inciting, compelling, or coercing any person present in a City facility, whether or not that person is an employee of the City, from engaging in any conduct prohibited by this Policy, including, but not limited to, conduct that creates a hostile work environment based on any protected characteristic.

B.    Applicability

Everyone who works within New York City government or its workplaces, or who seeks employment within City government, is covered by federal, state, and local employment laws, and this Policy.  This includes all current employees, managers (including executives and senior level staff members), supervisors, co-workers, paid and unpaid interns,[13] and job applicants.

---

[13] The prohibition of discrimination against interns was added in the New York City's Human Rights Law on April 15, 2014.

This Policy not only protects individuals from prohibited conduct because of their own protected status (such as their own actual or perceived race, religion, national origin, or disability), but also protects individuals from conduct motivated by the actual or perceived race, religion, national origin, or disability, etc., of other persons with whom they are associated.   For example, this Policy applies to individuals who are subjected to adverse actions because of their marriage to, or domestic partnership or association with, persons of a particular racial, religious, or national origin group, or persons who have a disability.   Moreover, discrimination based on an individual's name(s) or spouse's or domestic partner's name(s) that is associated with a particular racial, religious, or national origin group is prohibited.

These protections apply to actions, whether or not intentionally offensive or directed at a particular person or group, which violate this Policy.

This Policy extends to conduct which occurs at any location that could be reasonably regarded as an extension of the workplace, such as any field location, off-site business-related social function, City vehicle, or facility where City government business is being conducted and discussed.

In addition, Work Experience Program ("WEP") participants have a right to a workplace that is free of discrimination, including harassment based on race, color, national origin, religion, gender, disability, or age, and any basis that could otherwise be determined to be prohibited behavior pursuant to the Policy as applied to employees or applicants for employment.

All City employees, interns, and WEP participants are expected to be respectful of everyone in the City's workplaces and members of the public, and to be sensitive to the effects of their behavior on those around them.   All employees, interns, and WEP participants must be trained in the requirements of this Policy and must receive a copy of the EEO Policy Handbook, *About EEO: What You May Not Know."

## II.   Specific Protections

The following sections are provided to enable individuals to understand the unique definitions, issues, rights, and responsibilities under this Policy pertaining to sexual harassment and discrimination based on disability, religion, retaliation, and status as a victim of domestic violence, sex offenses, or stalking.

A.      Sexual Harassment

Sexual harassment is a form of employment discrimination which is prohibited by law. The federal government created guidelines which define sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . when: 1) submission to the conduct is made either explicitly or implicitly a term or condition of an individual's employment; 2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or 3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."[14]

Sexual harassment may involve individuals of the same or different gender(s). A broad range of behavior may be considered sexual harassment, including sexually suggestive remarks, pictures or gestures, verbal abuse or harassment of a sexual nature, subtle or direct propositions for sexual favors, and any unnecessary touching, patting, or pinching.

B.      Disabilities

Discrimination against a person based on that person's actual or perceived disability, record of disability, or relationship with a person with a disability will not be tolerated by the City of New York. For the purpose of this Policy, a disability is: 1) a physical, medical, mental, or psychological impairment; 2) a history or record of such impairment; or 3) being regarded as having such impairment.

The City of New York and its agencies will take appropriate action to provide reasonable accommodations to qualified employees and job applicants with disabilities, unless providing such accommodations creates an undue hardship. Reasonable accommodations include the provision of equipment, changes in workplace policies and practices, and other forms of assistance that allow people with disabilities to apply for a position, perform their jobs, or enjoy equal benefits and privileges of employment as are enjoyed by other similarly situated employees without disabilities.

Whether an accommodation is reasonable will depend upon the circumstances of the particular request. Some examples of accommodations that may be reasonable include: making facilities physically accessible to, and usable by, persons with disabilities; job restructuring; modifying work schedules; providing or modifying equipment or devices; providing qualified readers, interpreters, auxiliary aids, and/or other support services; and providing leave and/or arranging for transfer or reassignment to a vacant position, if such transfer or reassignment does not violate

---

[14] Code of Federal Regulations, Title 29, Section 1604.11.

the Civil Service Law, Personnel Rules and Regulations, other applicable laws, or regulations and/or collective bargaining agreements.

Undue hardship may exist when an accommodation is significantly difficult, unduly costly, extensive, substantial, disruptive, or would change the nature or operation of an agency's business.

The City of New York encourages employment of and promotional opportunities for qualified persons with disabilities. For example, pursuant to Section 55-a of the New York State Civil Service Law, where agency needs and availability permit, the City encourages agencies to utilize the 55-a Program, which will allow City agencies to employ qualified persons who have been certified as disabled in competitive positions on a non-competitive basis. Individuals who wish to apply for the 55-a Program are encouraged to seek assistance from the Agency Personnel Officer or 55-a Coordinator.

C.    Religion

The Policy prohibits adverse employment actions based on a person's religion. This includes discriminatory practices and decisions, harassment, hostility, or other adverse actions because of a person's actual or perceived creed, religious affiliation, religious beliefs, observances, or practices.

In addition, depending on the circumstances, agencies must try to reasonably accommodate the religious observances, beliefs, or practices of an employee or job applicant, unless the accommodation creates an undue hardship. A reasonable accommodation for religion may be a change in a workplace rule or practice that allows an individual to respect his or her religious observances, beliefs, or practices. City agencies may be required to provide accommodations for religion such as flexible arrival and departure times, and/or leave; voluntary exchanges of shifts or assignments; time and/or place to pray; accommodations relating to appearance and dress; and modifying workplace practices, policies, and/or procedures.

City agencies are not required to provide accommodations that are too costly or difficult to provide, that would be disruptive, or would interfere with job performance.

D.    Retaliation

It is a violation of the Policy to retaliate against or harass any person who asserts his or her rights regarding employment discrimination by:  1) opposing discriminatory practices in the workplace;  2) complaining about prohibited conduct;

or 3) participating in any way in the complaint, investigation, or reasonable accommodation processes.  It is also a violation of this Policy to retaliate against or harass someone because of his or her association with such an individual.

Behaviors which may be considered retaliatory include, but are not limited to: threats, reprimands, negative evaluations, harassment, refusal to hire, denial of promotion or job benefits, demotion, suspension, discharge, negative references to prospective employers, or other actions affecting the terms, conditions, or privileges of employment.

Examples of behavior that are protected against retaliation under this Policy include, but are not limited to: expressing an intent to file a charge or complaint alleging prohibited conduct; participating as a witness in an EEO investigation, administrative proceeding, hearing, or trial; and/or seeking a reasonable accommodation.

E.   Domestic Violence, Sex Offenses, or Stalking

The New York City Human Rights Law prohibits employment discrimination against persons who are victims of domestic violence, or victims of sex offenses or stalking, as defined by that law and the New York State Penal Law.  Agencies shall provide reasonable accommodations that do not create undue hardship and that enable such persons to satisfy the essential requisites of a job, provided that the status as a victim of domestic violence or victim of sex offenses or stalking is known, or should have been known, by the agency.

III.   **Procedures**

A.   Reporting Violations

Anyone who believes that he or she has been subjected to any action, decision, or harassment in violation of this Policy, or who witnesses others being subjected to improper conduct, is urged to promptly report the incident(s) to his or her supervisor or manager; to agency personnel supervising the application, testing, and interviewing process; or directly to the EEO office at the agency where the violation actually occurred, or which is the employer of the individual who purportedly committed the complained of act(s).  Supervisors, managers, or human resources personnel who receive EEO complaints, or otherwise become aware of any improper discrimination, must notify the agency EEO Officer.  Supervisors and managers should also encourage individuals who believe that the Policy has been violated to consult with the EEO office.

An individual who believes that this Policy has been violated may report the incident orally or in writing. Where the report is taken orally, the manager, supervisor, or EEO representative shall document the report. The EEO office will assist any individual in determining whether the conduct or decision reported is appropriate for the complaint process. Where an individual chooses to file an internal complaint with the agency EEO office, that complaint must be filed within one year of the event which is the subject of the complaint.

Persons who wish to discuss a possible violation of this Policy without revealing their identity may do so by telephoning or writing the EEO office. In such cases, the EEO office will provide counseling and take such follow-up action as may be appropriate and possible, given the restraints of anonymity.

If any employee knowingly makes a false accusation of discrimination or knowingly provides false information in the course of an investigation of a complaint, such conduct may be grounds for discipline. A complaint made in good faith, even if found to be unsubstantiated, will not be considered a false accusation.

B.    Contact with the EEO Office

An employee has a right to meet privately with an EEO representative. Such a meeting may take place either during or outside of office hours. If an employee makes a request to meet with an EEO representative during office hours, the employee should obtain approval from a manager or supervisor in order to leave his or her work assignment. An employee need not disclose the purpose for or details of the meeting with an EEO representative. Reasonable leave requests to meet with an EEO representative during work hours cannot be denied by managers or supervisors. Managers and supervisors shall allow employees to meet with EEO representatives at the earliest practicable time consistent with the operational needs of their units. Where an agency has more than one EEO representative, an employee is not required to meet with an EEO representative who works in the employee's division.

At the employee's request, arrangements may also be made to hold the meeting before or after office hours, or during the employee's lunch period. Should such a meeting take place entirely on the employee's own time, he or she need not advise a manager or supervisor of the meeting, or obtain the consent or approval of a manager or supervisor. The EEO representative will arrange to meet with an employee at outside premises where appropriate and/or necessary in order to ensure confidentiality. If necessary, EEO representatives will make arrangements for sign language interpreters and other forms of effective communication with persons with disabilities.

The EEO representative will discuss and research appropriate options, including actions an individual could take on his or her own behalf, referrals to other offices and/or agencies, mediation, investigation, and/or interim relief. The EEO representative may also facilitate any further discussions with other agency personnel.

In appropriate cases, an EEO investigation may be conducted in conjunction with or by an agency's General Counsel's office, Inspector General, or disciplinary officer. In addition, there may be exceptional circumstances under which an investigation may be conducted by another individual or entity, as deemed appropriate by the Law Department or DCAS.

Any person who is interviewed during the course of an EEO investigation has a right to be accompanied by a representative of his or her choice. This includes individuals who make complaints, persons against whom complaints were made, or witnesses. It is preferable that the EEO office receive advance notice that the person who is being interviewed will be bringing a representative.

Any person who is the subject of the complaint will have an opportunity to respond in writing.

All employees are expected to cooperate with EEO investigations. Failure to cooperate in an investigation may result in disciplinary action.

C.    Withdrawing Complaints

A complaint of discrimination may be withdrawn at any time by the person who filed the complaint. Withdrawal of a complaint must be made or confirmed in writing. In some instances, the agency EEO Officer will find it appropriate to end the investigation when the complaint is withdrawn. Prior to ending the investigation, the EEO Officer must determine whether the agency should take corrective action to address inappropriate conduct. If the EEO Officer determines that corrective action is required, it may be necessary for the EEO Officer to continue the investigation or recommend action to remedy inappropriate behavior.

D.    Mediation

Mediation is a voluntary, informal, and confidential process that provides an opportunity for everyone involved in a complaint to come to a mutual agreement about how the complaint should be resolved. It is an alternative that may quickly resolve complaints without a full investigation.

All requests for mediation should be made to the EEO Officer. Mediation may be requested by any party involved and may be declined by any party.

The EEO Officer will determine whether the complaint is appropriate for mediation. The EEO Officer may choose to conduct the mediation internally within the agency, or externally through entities that provide mediation services.

Mediation may be terminated by any party to the mediation. If this occurs, the EEO Officer will inform the other party or parties in writing that the mediation has been terminated. In the event that mediation does not result in a resolution, the EEO Officer will provide the parties with a written statement informing the parties of the complainant's right to an investigation of the allegation. Where efforts to mediate complaints are unsuccessful, complaints will be investigated by the EEO office.

E.    Concluding the Complaint Investigation

The EEO Officer will submit a confidential report of the complaint investigation to the agency head at the conclusion of the investigation. If the EEO Officer concludes that a violation of this Policy has occurred, the EEO Officer will recommend appropriate corrective action. The agency head will review the EEO Officer's report and promptly issue a determination adopting, rejecting or modifying the recommended action. Such determination shall be in writing and may be issued electronically. The EEO Officer will advise all parties in writing of the outcome of a complaint.

Any person found to have engaged in conduct or practices in violation of this Policy may be subject to discipline which may include a reprimand, suspension, probation, demotion, transfer, termination, or any other measures permitted by law and/or collective bargaining agreements. In addition to implementing such disciplinary action, agencies may take such steps as may be necessary to address the impact that any violation of this Policy has had on the complainant or within the agency.

F.    Other Places Where Complaints May Be Filed

The following federal, state, and local agencies enforce laws against discrimination:

- New York City Commission on Human Rights:
  http://www.nyc.gov/html/cchr/html/home/home.shtml
- New York State Division of Human Rights: http://www.dhr.ny.gov/

10

- United States Equal Employment Opportunity Commission (the "EEOC"): http://www.eeoc.gov
- United States Department of Justice: http://www.justice.gov/

Information about how to contact these agencies can be found in the EEO Policy Handbook, *"About EEO: What You May Not Know,"* at http://www.nyc.gov/html/dcas/html/about/eeo_booklet.shtml, the DCAS website at http://www.nyc.gov/html/dcas/html/about/eeo.shtml, or the Office of Citywide Diversity and EEO at 1 Centre Street, 17th Floor North, New York, NY 10007, (212) 386-0257. Please note that there are statutory deadlines for filing complaints with each of these agencies.[15]

When a person exercises his or her right to file a complaint with a federal, state, or local administrative agency (known as an "external complaint") based on or related to the same facts and circumstances of an internal complaint, the agency EEO Officer will transfer the matter to the agency General Counsel, who will be responsible for any further handling of the matter. The EEO Officer will notify the complainant and the parties who are the subject of the complaint, in writing, that the investigation by the EEO Officer has been transferred because of the filing of the external complaint. The agency General Counsel will be responsible for handling external complaints regardless of the timing of such complaints (whether filed before the internal complaint is filed, at the same time that the internal claim was filed, or after the internal complaint was filed). After transfer of the complaint to the agency General Counsel, the EEO Officer will cooperate with the General Counsel with respect to the ultimate resolution of the complaint.

G.    Requests for Reasonable Accommodations

City agencies may be required to provide reasonable accommodations when requests are made in connection with disabilities; pregnancy, childbirth, and related medical conditions; religious beliefs, observances, and practices; or for victims of domestic violence, sex offenses, or stalking. The reasonable accommodation process should be flexible and interactive, involving agency representatives who are necessary to the reasonable accommodation process and the individual who is requesting a reasonable accommodation. In all instances, the agency EEO office should be notified of the request in order to facilitate discussions, research appropriate accommodations, and assist in the resolution of the matter.

---

[15] The deadline in some instances is as short as 180 days. Therefore, to preserve their rights, individuals who believe that they have been discriminated against and wish to file a complaint with an external agency should promptly contact the City Commission on Human Rights, the State Division of Human Rights, the EEOC, the Department of Justice, or a private attorney for further guidance.

11

EEO representatives, agency personnel supervising any phase of the application process, and/or managers and supervisors involved in the process shall notify individuals who request reasonable accommodations whether the request has been granted. Where the specific accommodation requested is impracticable, agency representatives will seek to implement an appropriate alternative reasonable accommodation. The following procedures detail the specific aspects of each type of request.

    1) Disabilities: An employee or job applicant with a disability who requests reasonable accommodations to enable him or her to satisfy the essential functions of the job or enjoy the rights in question may make such requests to his or her manager or supervisor, agency personnel supervising the application process, or directly to the agency EEO Officer or Disabilities Rights Coordinator.[16] A request for a reasonable accommodation may be made orally or in writing. Where the request is made orally, it shall be documented by that person who receives the request.

    EEO Officers and/or Disabilities Rights Coordinators, agency personnel supervising the application process, and managers and supervisors involved in the process shall provide reasonable assistance (such as help in completing forms) to an individual requesting an accommodation. Additionally, if a reasonable accommodation is requested to facilitate an individual's ability to apply for employment, the agency staff supervising the application procedures may be required to assist the applicant in completing the application process.

    By law, all documentation and information concerning the medical condition or history of an individual requesting a reasonable accommodation for a disability must be collected and maintained on separate forms, and in separate medical files, apart from other personnel data. Such information must be treated as confidential medical records, except that managers and supervisors may be informed of necessary restrictions on work and accommodations required. Furthermore, medical information may be provided: 1) to first-aid and safety personnel, if the disability might require emergency treatment; 2) to government officials investigating the agency's compliance with applicable laws; 3) to workers' compensation offices in accordance with Workers' Compensation Law; and 4) for insurance purposes.

    2) Religious Accommodations: An employee or applicant requesting reasonable accommodations for religion may make such requests to his or her manager or supervisor, agency personnel supervising the application process, or directly to the agency EEO Officer. Requests for religious accommodation should be documented by the individual receiving the request.

---

[16] A Disability Rights Coordinator is responsible for ensuring compliance with federal, state, and local laws and the Policy regarding people with disabilities.

12

3)   Victim of Domestic Violence, Sex Offenses, or Stalking:   An employee or applicant requesting reasonable accommodations for domestic violence, sex offenses or stalking may make such requests to his or her manager or supervisor, agency personnel supervising the application process, or directly to the agency EEO Officer.

Agencies may require a person requesting a reasonable accommodation to provide certification that the person is a victim of domestic violence, sex offenses, or stalking.   The person requesting the reasonable accommodation shall provide a copy of such certification to the agency within a reasonable period after the request is made.  A person may satisfy the certification requirement by providing documentation from an employee, agent, or volunteer of a victim services organization, an attorney, a member of the clergy, or a medical or other professional service provider from whom the individual seeking a reasonable accommodation, or that individual's family or household member, has sought assistance in addressing domestic violence, sex offenses, or stalking and the effects of the violence or stalking; a police or court record; or other information consistent with the disclosure and the request for accommodation.

4)   Pregnancy:[17]   An employee or job applicant requesting reasonable accommodations due to pregnancy and those who suffer medical conditions related to pregnancy, childbirth, or a related medical condition may make such requests to her manager or supervisor, agency personnel supervising the application process, or directly to the agency EEO Officer or Disability Rights Coordinator.   Such a reasonable accommodation may include bathroom breaks; leave for a period of disability arising from pregnancy, childbirth, or related medical conditions; breaks to facilitate increased water intake; periodic rest for those who stand for long periods of time; and assistance with manual labor, among other things.

All information, including a statement of the person requesting a reasonable accommodation or any other documentation, record, and the fact that the individual has requested or obtained a reasonable accommodation, shall be retained in the strictest confidence by City agencies, except to the extent that disclosure is requested or consented to in writing by the person requesting the reasonable accommodation, or is otherwise required by applicable federal, state, or local law.

Where an employee or job applicant has requested a reasonable accommodation consistent with these procedures and the agency representative has not provided the reasonable accommodation, an appeal may be made to the agency head.  Within 10 business days of receipt of an appeal, the agency head, or his or her designee, shall:

---

[17]  The City's Human Rights Law was amended to include reasonable accommodations related to pregnancy, childbirth or related medical conditions effective January 30, 2014.

1.      obtain the request for reasonable accommodation made by the employee or applicant and review all related documentation, standards, procedures, and potential accommodations;

2.      meet and/or consult with the employee or applicant, the EEO Officer, and any agency representative that the agency head deems necessary to the reasonable accommodation request;

3.      evaluate the reasonableness of employee's or applicant's and agency representative's preferences regarding the accommodation request, giving primary consideration to the employee's or applicant's preferences; and

4.      consult with the DCAS Office of Citywide Diversity and EEO or the Law Department.

Within 15 business days of receipt of the appeal, the agency head or his\her designee, shall issue a written determination on the request for reasonable accommodation, specifying what accommodation shall be provided, if any, and, where necessary, directing the appropriate agency representative to implement such accommodation promptly.  The EEO Officer or Disability Rights Coordinator shall monitor implementation of the reasonable accommodation.

G.      Confidentiality

All complaints, investigations, requests for accommodations, and records will be handled, to the extent possible, in a manner that will protect the privacy interests of those involved.  EEO matters may be discussed with other persons who may have information about a complaint or who are necessary to implement reasonable accommodations for disability, religion, status as victims of domestic violence, sex offenses or stalking, and pregnancy, childbirth, or a related medical condition. Therefore, it may be necessary to disclose information to persons with a legitimate need to know about the matter.

H.      Documentation

All inquiries, complaints, requests, mediation efforts, investigations, requests for accommodation, and their outcomes will be documented by the EEO office.

J.    Additional Sources of Procedural Information

The Guidelines for the Implementation of the City's Discrimination Complaint Procedures may be found online:
http://www.nyc.gov/html/dcas/downloads/pdf/misc/eeo_discriminationcomplaint procedures.pdf

The City's Reasonable Accommodation Policy and Procedure may be found online:
http://www.nyc.gov/html/dcas/downloads/pdf/misc/eeo_reasonableaccommodati on.pdf

## IV.   Agency-Specific Diversity and EEO Plans

Agency heads are required by the New York City Charter to annually prepare, adopt, and implement a plan to provide equal employment opportunity. The plan must be prepared based on uniform procedures and standards provided by DCAS. DCAS will work with agency heads to help them develop realistic and achievable objectives.

Each agency head or, at his or her direction, the agency EEO Officer and/or APO, should review agency statistical information (including total employment and new hires and promotions, by race/ethnicity, and gender), EEO complaints made during the previous fiscal year and the agency's employment practices, policies, and programs. The agency head should then work with the EEO Officer, General Counsel and APO to identify: 1) whether there are any barriers to equal opportunity within the agency; 2) the agency's obligations as a result of government grants and/or contracts; and 3) what, if any, corrective actions are required under court decrees and/or governmental audits. Agencies may wish to seek the advice of the Law Department or consult with the DCAS Office of Citywide Diversity and EEO regarding the development of agency Diversity and EEO Plans.

The Diversity and EEO Plan should communicate the agency's intention to promote equal employment opportunity and diversity and inclusion by continuing effective measures or implementing new strategies and programs (i.e., preventive, corrective and risk management strategies in areas such as recruitment, training, selection, promotion, and policy dissemination standards) that prevent, diminish, or eliminate barriers to equal opportunity employment. DCAS will provide agencies with formats and recommendations for Diversity and EEO Plan development that are consistent with employment practices recommended by human resources management organizations and enforcement entities.

15

Although each agency's Diversity and EEO Plan will be tailored to the specific issues of that agency, there are some general measures that all agencies are required to implement. Each agency's Diversity and EEO Plan must, at a minimum, include the following:

- A commitment to ensure fair employment practices, and promote a workplace that values its employees in support of the City's diversity and inclusion strategy. The commitment will hold EEO Officers and representatives, human resources professionals, managers and supervisors accountable for ensuring that the agency does not discriminate against employees or applicants for employment and support the diversity and inclusion initiatives at the agency. This commitment should be reflected in the agency strategic plan, mission, vision, and performance metrics. It should also include the agency's strategy to ensure equal employment opportunity and to implement the best diversity and inclusion practices at the agency. The commitment should also be communicated to all employees through a Commitment Statement to affirm the principles of equal employment opportunity and diversity and inclusion.

- A commitment to assess recruitment efforts to determine whether such efforts adversely impact any particular group and what recruitment sources yield a diverse pool of qualified candidates. It should also include the agency's strategy to implement the best diversity and inclusion recruitment practices to ensure equal employment opportunity. Minimally, agencies should identify relevant professional and community organizations serving women and minorities throughout the City, review and update listings of recruitment outreach sources, and contact such organizations when positions not filled through civil service lists become available or where agencies may otherwise use discretion in hiring.

- A commitment to assess agency job postings to ensure appropriate diversity, inclusion, and equal opportunity employer messaging.

- A commitment to assess the manner in which candidates are selected for employment, to determine whether there is any adverse impact upon any particular racial, ethnic, disability, or gender group. To the extent that adverse impact is discovered, the agency head will determine whether the criteria being utilized are job-related. If the criteria are not job-related, the agency will discontinue using that method. Methods which diminish adverse impact will be preferred over those with greater impact, provided that the agency's job-related aims are not compromised by using the method with a diminished impact. Examples of selection methods which may diminish adverse impact include race/ethnicity-neutral and gender-neutral questions in interview materials and assembling interview panels that reflect gender, race and ethnic diversity. The agency will also ensure that, to the extent practicable, agency

16

- Participating in career and job fairs.

- Whenever possible, promoting public service as a career choice at schools, colleges and universities.

- Using internships, work/study, co-op, and scholarship programs to attract interested persons and to develop and hire interested and qualified candidates.

- Sponsoring open houses (i.e., networking events, facilities tours).

- Working with appropriate DCAS personnel to review the competencies, skills and abilities required (as presented in job vacancy notices and notices of examination) for available positions to ensure that these standards are updated, job-related, and required by business necessity.

- Reviewing application forms and agency materials and products in order to ensure that they do not contain discriminatory language or images.

- Ensuring that human resources personnel, managers, supervisors, and other personnel involved in the recruitment and hiring process are trained in interviewing, selection, hiring skills, and EEO, to enable such individuals to correctly identify the most capable candidates.

- Implementing and encouraging inclusive skills and behavior standards for managers to ensure that they are able to maximize their professionalism, performance and communication skills.

- Conducting or encouraging the use of training and development programs to improve skills, performance, and career opportunities of all employees.

- Creating talent pools through employee surveys and databases, to promote cross-training, mentoring, coaching, stretch assignments, cross divisional assignments, job transfers, and rotation programs for career enhancement and development experiences.

- Planning and administering employee incentives, quality of work life and recognition programs, engagement surveys, performance evaluations, employee resource groups, and diversity councils.

- Promoting employees' awareness of opportunities for promotion and transfer within the agency, publicizing promotions and changes in the managerial ranks, and ensuring that the agency engage in succession planning for top managerial

18

positions. The agency considers its own employees for such opportunities by having programs that identify ready now and high potential talents.

The City of New York, through DCAS, will also:

- Provide the uniform procedures, formats, and reports required by the New York City Charter to facilitate the planning and review of the City's efforts to provide equal employment opportunity for employees and applicants for City government employment.

- Assess qualifications required for most civil service positions and ensure that civil service examinations are job-related and consistent with business necessity.

- Provide assistance to agencies to ensure that recruitment efforts fit particular human resource needs.

- Encourage agency job postings internally through City Jobs and externally through the City's website: http://www1.nyc.gov/jobs/

- Continue to conduct on-site EEO monitoring visits to agencies.

- Continue efforts to better ensure the accuracy of ethnicity and gender data.

## V.   Enforcement and Accountability Standards

### A.   Department of Citywide Administrative Services

DCAS is required to:   1) establish and enforce uniform procedures and standards for use by City agencies in establishing measures, programs, and plans to ensure equal employment opportunity, including a time schedule for the development, review and adoption of EEO plans;   2) establish a uniform format for use by City agencies for the presentation of statistical information on the workforce of City agencies;   and 3) develop resources regarding information on employment and educational programs.[18]  DCAS is also required to publish and submit annual reports on the activities of DCAS and the other City agencies with respect to equal employment opportunity.[19]

---

[18] See Charter Sections 814(a)(12)-(15).
[19] See Charter Section 814(b)(8).

Within DCAS, the Office of Citywide Diversity and EEO assists the Commissioner to develop and enforce the Policy, standards, and procedures. The Office of Citywide Diversity and EEO will assist City agencies by developing or collaborating on solutions, strategies and initiatives to effectively implement the provisions of the City Charter and other federal, state, and local laws, and monitoring the EEO-related activities of City agencies. In addition, DCAS maintains the data that is necessary in order to fulfill the City's EEO obligations under the City Charter and other federal, state and local laws.

B.     Agency Heads

Each agency head will ensure that his or her agency does not discriminate against employees or applicants for employment as prohibited by federal, state and local laws.[20]   Agency heads are accountable to their respective Deputy Mayors for their agencies' EEO practices.   Agency heads will also ensure that legal, human resources, and EEO personnel, managers, and supervisors:  1) receive a copy of this Policy (including any addenda);  2) are trained in EEO laws and procedures;  and 3) know how to carry out their responsibilities under this Policy.  Agency heads must distribute a copy of the EEO Policy Handbook, *About EEO: What You May Not Know*" to all employees and ensure that a copy is available on the agency's website.

As discussed in Section IV, each agency head must annually adopt and implement a Diversity and EEO Plan that communicates measures and programs that the agency will undertake to ensure fair and effective efforts to provide equal employment opportunity.  Draft Diversity and EEO Plans are to be developed and submitted each fiscal year according to the timetable and format established by DCAS, and must be reviewed and approved by DCAS.  Agencies are required to file copies of finalized agency Diversity and EEO Plans with the Mayor, the City Council, the Equal Employment Practices Commission ("EEPC"), and the City Civil Service Commission, and to also make Diversity and EEO Plans available for reasonable public inspection.[21]

Each agency head will then submit quarterly reports to DCAS, as well as to the Mayor, City Council, and EEPC, on the agency's efforts during the previous quarter to implement the agency Diversity and EEO Plan.  Such quarterly reports will also include a review and documentation of EEO complaints and requests for reasonable accommodations for said quarter.   Quarterly Diversity and EEO reports must, pursuant to the City Charter, be timely submitted to DCAS and the other entities mentioned above, no later than thirty (30) days following the reporting period using the reporting format provided by DCAS.

---

[20] See Charter Section 815(h).
[21] See Charter Section 815(a)(19).

In order to meet the City's obligations under the City Charter and other federal, state and local laws, and to achieve the goals of the agency Diversity and EEO Plan, each agency head must appoint a trained EEO Officer whose responsibility it will be to implement the Policy within that agency. Because EEO Officers will need independence of judgment as well as the authority of the agency head in order to carry out their responsibilities, the EEO Officer must report directly to the agency head, or if approved by DCAS, to a direct report to the agency head. In order to avoid potential conflicts of interest, under no circumstances should the EEO Officer report to the General Counsel. Where the agency's organizational structure necessitates multiple EEO representatives, such individuals should be selected from different office locations and, where possible, from a variety of levels within the organizational structure. The agency head must ensure that the responsibilities of the EEO Officer are competently discharged.

Agency heads should appoint at least two EEO representatives, who may not be of the same gender, to receive discrimination complaints and conduct investigations. Each agency head must designate a Career Counselor with appropriate training and knowledge, who is familiar with civil service jobs, to provide career counseling to employees who request such guidance. The agency head should also designate a Disabilities Rights Coordinator, whose responsibility it will be to ensure compliance with all federal, state, and local laws, as well as City and agency policies, pertaining to persons with disabilities. Usually the EEO Officer of each agency should serve as the Disabilities Rights Coordinator; however, when circumstances warrant, an agency head may designate another person to serve as the Disabilities Rights Coordinator.

Agency heads are required to sign off on all agency Diversity and EEO Plans and final determinations concerning EEO complaint resolutions and should conduct a quarterly review of EEO complaints and requests for accommodations. Such sign off may be in written or electronic form. Each agency head will ensure that all employees are provided with information that complies with the standards provided by DCAS regarding employee rights and obligations contained within this Policy, and with information about the complaint, investigation and reasonable accommodation procedures. The agency head will also ensure that the Policy, standards, and procedures are posted at each site where the agency conducts business. Such posting may include postings on electronic bulletin boards and intranet sites. Each agency head will ensure that each of the agency's employees is accountable for his or her compliance with EEO-related policies, and receives training in EEO laws.

Agency heads should ensure that information regarding employee rights and obligations, and the complaint, investigation, and reasonable accommodation procedures are available in appropriate alternative formats to employees and job applicants with disabilities.

21

supervisory responsibilities in a non-discriminatory manner;  3) receive training in EEO laws;  4) cooperate with the EEO Officer in the implementation of the Policy, standards, and procedures (including training, complaint resolutions, processing, recording, and reporting reasonable accommodation requests, EEO-related recruitment, and selection standards; and modifying agency procedures to ensure equal employment opportunity for applicants and employees);  5) promptly consult with the agency's EEO Officer if he or she observes, learns about, or suspects that a violation of this Policy has occurred;  6) where appropriate, encourage subordinates to consult with an EEO office;  7) allow employees to meet with EEO representatives at the earliest practical time consistent with the operational needs of his or her unit; and 8) maintain confidentiality with respect to EEO-related matters.

F.     Personnel Officers

Personnel Officers have primary responsibility for assisting the agency head in implementing the City's personnel policies and shall be knowledgeable regarding the interplay of EEO-related laws and other work-related legal regulations including Family Medical Leave Act, New York State Civil Service Law, and Workers' Compensation Law.  Personnel Officers should cooperate with EEO Officers in the implementation of the Policy, standards, and procedures including training objectives, complaint resolutions, and modifying agency procedures to ensure equal employment opportunity for applicants and employees.

Personnel Officers will also:  1) ensure that employees know the identity of the agency Career Counselor and ensure that all employees have access to information regarding job responsibilities, performance evaluation standards, examinations, training opportunities and job postings;  2) ensure that all new employees are advised of the Policy, standards, and procedures, the employees' rights and responsibilities under such policies, and the discrimination complaint procedures;  3) inform the EEO Officer on a quarterly basis of the number of 55-a Program participants and efforts that the agency has made to employ, promote, or accommodate qualified individuals with disabilities;  4) involve the agency EEO Officer in the review of EEO-related decisions, actions, and practices;  and 5) promptly consult with the agency's EEO Officer if he or she knows, has been informed of, or suspects that a violation of this Policy has occurred.

23